UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CHRISTOPHER R. LEWIS,

            Plaintiff,

v.

WILLIAM POLLARD, PETER ERICKSEN,
C.O. II VANLOO, DILLEN BERG
C.O. GIFFIN, MICHAEL BAENEN, and
JEANANNE G. ZWIERS,

            Defendants.

Case No. 11-CV-280-JPS

ORDER

      The *pro se* plaintiff, Christopher R. Lewis ("Lewis"), is proceeding *in forma pauperis* on a claim under 42 U.S.C. § 1983 that he has been subjected to severe sewage odors in his cell at the Green Bay Correctional Institution and deprived of medical treatment in violation of his Eighth Amendment rights, and that his First Amendment rights have been violated by retaliation against him for filing complaints. Before the court is the defendants' motion for summary judgment, along with the plaintiff's motion for reconsideration and the defendants' request for a stay of the proceedings.

1.      PLAINTIFF'S MOTION FOR RECONSIDERATION

      Lewis previously asked the court to order sanctions against the defendants for failing to produce records of any disciplinary actions taken against defendant Peter Ericksen ("Ericksen"). The court denied the motion for sanctions, but ordered the defendants to search for any responsive records and to respond specifically to the plaintiff's allegations that Ericksen was one of the two unnamed, white correctional officers mentioned in a May 30, 1993 newspaper article submitted by the plaintiff which describes racial harassment at Columbia Correctional Institution. (Court Order of July 26,

2012, Docket #143). In response, the defendants submitted an affidavit from Ericksen denying any involvement in the events described in the article and stating that he has never been disciplined by the Department of Corrections, along with two affidavits from correctional officials describing their unsuccessful search for any disciplinary records related to Ericksen. (Dockets #149, #150, and #151). Lewis is disappointed with this response and maintains that the defendants should be sanctioned for failure to keep better records of employee disciplinary matters. Because the defendants have documented their thorough search for responsive records and complied with this court's orders, no sanctions are warranted, and Lewis's motion for reconsideration will be denied.

2.   SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence

of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

3. FACTUAL BACKGROUND[1]

3.1 Parties

Plaintiff Lewis is an inmate who at all times material to this action was incarcerated at Green Bay Correctional Institution (GBCI).

Defendant William Pollard ("Pollard") is presently employed by the Wisconsin Department of Corrections (DOC) as Warden of the Waupun Correctional Institution (WCI). Pollard previously was employed as Warden at GBCI from March 2005 to April 2011. Defendant Michael Baenen ("Baenen") has been employed as Warden at GBCI since March 27, 2012. Previously, Baenen was the Deputy Warden at GBCI.

Defendant Ericksen has been employed as Security Director at GBCI since August 2000.

Defendants Brian VanLoo ("VanLoo"), Larry Dillenberg ("Dillenberg"), and Benjamin Giffin ('Giffin") are all employed as Correctional Officers at GBCI.

Defendant Jeananne Zwiers ("Zwiers") is employed as the Health Services Manager in the Health Services Unit (HSU) at GBCI.

---

[1] Facts are taken from the undisputed portions of the Defendants' Proposed Findings of Facts (Docket #110), as well as the plaintiff's verified amended complaint (Docket #40), and supporting affidavits filed by the parties.

### 3.2 Sewer Odor

When an inmate has a maintenance problem, such as a drain that is emitting an odor, they are to contact their unit staff to look into and to fill out a work order if deemed appropriate. Occasionally, there is an odor from the floor drains. Approximately twice a year, staff will pour a 50/50 solution of bleach and warm water down the drains to clean and sanitize them. This procedure was completed in July 2010. Maintenance staff typically clean the floor drains in the hallway. The segregation security staff typically clean the floor drains in the individual cells. As stated above, when GBCI cleans/sanitizes the drains, they typically clean/sanitize all of the drains.

GBCI policy does not allow inmates to possess bleach to clean their own drains, as this would present a security issue. The inmate could try to throw the bleach in the officer's face or eyes. However, Lewis avers that he and other inmates were given bleach to pour down their drains in July of 2010.

Lewis filed offender complaint GBCI-2011-1273 regarding the sewage smell in his cell. The report from the Institution Complaint Examiner (ICE) states the following:

> Mr. Lewis claims his drain smells of raw sewage. Mr. Lewis states he started covering the drain in August of 2010, but writes in his date of incident 1/10/11 "notified Schultz."
>
> Sgt. Greil stated that he has not been informed by Mr. Lewis nor has staff notified him that Mr. Lewis has a concern with his drain. Sgt. Greil stated he would have staff check into Mr. Lewis' claim and will if necessary complete a work order to have the problem remedied.
>
> The most efficient way to deal with a drain or maintenance type problem is to immediately bring it to staff's attention, and it will be corrected.

Pollard was the reviewing authority. Based on the information from the ICE's investigation, Pollard felt confident that Lewis' concerns were being addressed. On January 18, 2011, in agreement with the ICE, Pollard dismissed the complaint with the modification that a copy of the offender complaint be given to the segregation supervisors. This was the only written complaint Lewis made in regards to the drain odor. No other inmates filed written complaints regarding drain odors in the segregation unit during this time.

Lewis entered cell #431 in June 2010 and left cell #431 on August 12, 2011. He is currently in general population in the South Cell Hall, H-1. According to Lewis, Sgt. Greil (who is not a defendant) wrote to Lewis in January or February of 2011 that he would submit a work order for his drain. However, there were no work orders for Lewis' drain in cell #431 from June 1, 2010, until August 12, 2011.

Ericksen does not recall receiving any correspondence from inmate Lewis regarding a drain smell. Baenen has no knowledge of, nor was he ever personally involved in, addressing any issues or complaints related to sewage odors in Lewis' cell and he does not have any documentation relating to this issue.

### 3.3     Complaints about VanLoo and Ericksen

Ericksen recalls receiving correspondence from inmate Lewis about staff harassment. He believes it was pertaining to VanLoo. Ericksen no longer has that correspondence. Ericksen believes there were several investigations regarding allegations made by Lewis. He does not recall the specifics of those allegations or the investigations into those allegations.

From June 2010 until March 2011, Pollard assigned Baenen the task of reviewing complaints related to allegations of staff misconduct and ordering

investigations for staff actions when appropriate. Baenen and Pollard reviewed offender complaints filed by Lewis about VanLoo regarding medication, an odor coming from the drain in his cell and/or conduct reports written by VanLoo. Baenen also reviewed offender complaints filed by Lewis regarding conduct reports complaining about Dillenberg regarding medication and/or conduct reports written by Dillenberg.

Between June 2010 and July 2011, Lewis made numerous complaints alleging VanLoo was harassing him. Four investigations were conducted and none of Lewis' complaints were substantiated. The only conduct report that Dillenberg wrote for Lewis between June 2010 and April 2011 is dated March 12, 2011, and was written for disruptive or disrespectful conduct. Dillenberg wrote that Lewis placed his bare buttocks up against the open trap in his cell door and passed gas, and then insulted Dillenberg for wearing a smelly uniform. Lewis states that he simply insulted Dillenberg's wife as a response after Dillenberg told him that he smelled, and that Dillenberg falsified the conduct report by making up other allegations against him. Lewis was restricted to the back of his cell for seven days as a consequence for the conduct report, but Erickson lifted the restriction after two days because he determined the back of cell security precaution was not necessary.

Lewis avers that on April 23, 2011, Vanloo denied him his medications during med pass, and on September 18, 2010, Vanloo tried to give him medicine that had been dropped on the ground. Lewis further avers that on January 18, 2011, Dillenberg refused to look for his ibuprofen until the noontime meds. Lewis also avers that on January 14, 2011, Dillenberg told him that he could not find his ibuprofen. Lewis suspects that Dillenberg hid the bottle on the medication cart, and other correctional officers were unable to find it for the next four days. Vanloo and Dillenberg aver that they did not

deny Lewis his medications or tamper with them, and that they did not retaliate against Lewis in any way for filing complaints.

### 3.4 Medical Complaints

On January 13, 2011, Lewis was seen by the nurse after submitting a Health Services Request (HSR) complaining that he has headaches caused by an odor from his sewer drain. He stated that he was having the headaches three to four times a week since Christmas. A nurse saw Lewis and completed an assessment. The nurse instructed Lewis to increase his fluid intake to improve his hydration status, and to consider requesting a routine eye exam. Ibuprofen was placed on the medication cart per protocol. Lewis was advised to follow-up with HSU on the effectiveness of his medication. His weight was 205 lbs.

On February 17, 2011, Lewis was seen by the nurse pursuant to a HSR complaining of dry skin. The nurse who saw Lewis noted a thick yellow callus on his great toes and ordered foot soaks per protocol. His weight was 189 lbs.

In early 2011, inmate Lewis requested a refill for his ibuprofen. Lewis was instructed that he could obtain the ibuprofen from the stock on the medication carts. On or about March 16, 2011, Zwiers was contacted about Lewis's complaint that HSU would not give him his own prescription of ibuprofen because the medication cart is only stocked 2 out of 7 days. The ICE contacted Zwiers and nursing staff and summarized their response in dismissing the complaint:

> Nurse Lutsey stated there is not a need for a prescription for stock medication; Mr. Lewis may receive a stock medication at any of the four med pass times during the day. The Med Room Nurses stated that they are very aware of Mr. Lewis' complaint. The Nurses noted that Mr. Lewis is presently on the

> 400 Wing of the Segregation Unit and they specifically make sure that cart is stocked.

(ICE Report, Docket #102-6 at 2).

On March 18, 2011, Lewis was seen by the physician, who reviewed his vitals and stated that Lewis was stable. The doctor changed the frequency of Lewis's checkups to every six months for his Hypertension Care Plan. Lewis weighed 193 lbs.

On March 23, 2011, Lewis was seen by the nurse pursuant to his request for dizziness, lightheadedness and queasiness 3-4 times a week, which he believed was due to the strong smell from his drain. The nurse completed a thorough physical assessment and informed Lewis there were no abnormalities noted. The nurse also noted that Lewis was well muscled with good energy and that he has lost 60 lbs. in the past ten months. His weight was 180 lbs. Lewis reported that he believed his weight loss was due to being in segregation for much of that period and when he had been in general population he ate a lot of canteen and was able to maintain a higher weight. The nurse noted that Lewis had a very strong body odor. Lewis states that he uses his sink to wash every morning, and security staff reported that Lewis worked out every morning. The nurse offered the possibility that the odor in his cell was possibly his own body odor as security staff have noted the body odor smell outside his cell. The nurse encouraged Lewis to have labs as previously ordered which may be helpful to the physician and Lewis agreed.

On March 29, 2011, Lewis was seen by the nurse for a comprehensive health panel, lipids and complete blood count draw. The results were unremarkable and reviewed by Dr. Heidorn on April 16, 2011; no changes to

the patient's plan of care were made. Lewis also reviewed his medical record and received copies per his request.

On April 22, 2011, Lewis was seen by the doctor, and a Hypertension Care Plan was completed. Follow-up labs were ordered for the following week, including thyroid studies, Vitamin D level and H. pylori. His weight was 191 lbs. On April 26, 2011, Lewis was seen by the nurse (J. Lutsey) and lab work was drawn. On May 4, 2011, the physician reviewed the results, the thyroid was normal, his vitamin D was slightly low, the H. pylori was positive. No new orders were written at this time.

On May 25, 2011, Lewis was seen in the HSU pursuant to an HSR for complaints about his psych medications. He was told via HSR if he thought his medication was causing his dizziness, he could stop if he wished and his HSR would be forwarded to the psychiatrist. Lewis was given an appointment to see the physician the following week for nightmares and dizziness, which are listed as a side effect of the medications. Lewis's weight was 187 lbs, and he did not complain of stomach problems.

On June 9, 2011, Lewis was seen in the HSU pursuant to a HSR for a request for ibuprofen for complaints of headaches. Lewis described his headaches as being "not migraines – throbbing pain behind the eyes and temple areas." Lewis reported to the nurse that he had glasses since the 7th grade and that his last eye exam was two years ago. Lewis reported that he was using stock ibuprofen as needed, but was adamant about wanting his own on the cart because the stock ibuprofen was not available on the cart 4-5 times a week. A follow up appointment was made with the physician. His weight was 194 lbs., and no complaints of stomach problems were documented. On July 1, 2011, Lewis was seen by the physician for complaints

of headaches. Ibuprofen was ordered. No complaints of stomach problems were raised at this time.

4.   ANALYSIS

The defendants argue that prison staff appropriately addressed Lewis's complaint regarding the drain odor in his cell, and that the drain odor did not rise to the level of an Eighth Amendment violation. The defendants also submit that they were not deliberately indifferent to any serious medical needs of Lewis and that they did not retaliate against Lewis.

In response, Lewis maintains that the sewer odor was so severe that it gave him headaches and caused him to lose weight and develop an irregular heartbeat, and that the sewer odor was never properly addressed although he complained repeatedly about it. Lewis further argues that the defendants were deliberately indifferent to his need for health care and medicine, and that they harassed him to retaliate for filing complaints.

4.1   Eighth Amendment Sewer Odor and Medical Care Claims

The plaintiff alleges that he was subjected to sewage odors in his cell beginning on June 18, 2010, and continuing through the filing of this lawsuit on March 21, 2011. The plaintiff left cell #431 on August 12, 2011, and is now assigned to a different cell hall. The plaintiff states that the sewage odors in his cell caused him to suffer severe headaches and lose weight. Ordinarily, mere exposure to unpleasant odors does not constitute an Eighth Amendment violation. *See Sain v. Wood*, 512 F.3d 886 (7th Cir. 2008). ("[Plaintiff] submits that the peeling paint, foul odor and lack of air-conditioning in his cell, his inability to open his window without letting in bugs, and a cockroach infestation in his unity amounted to inhumane treatment in violation of the Fourteenth Amendment…[however, t]he peeling paint or an unpleasant odor in a cell described in this record, along

with the absence of any evidence of serious injury, does not amount to constitutional deprivation.").

The record reflects that Lewis lost a significant amount of weight, but nothing suggests that his weight loss was unhealthy. Lewis's lowest recorded weight was 180 pounds, and his medical records reflect that he was muscular and energetic. The record also reflects his statement to a nurse that he lost weight in segregation because he had less access to canteen food.

Nor are headaches and dizziness necessarily serious ailments. However, in this case Lewis claims he was subjected to the sewer odors for over a year, and suffered frequent headaches over a prolonged period as a result. Accordingly, given the duration of these conditions, the court will treat Lewis's exposure to sewer odors and his resulting headaches as serious conditions. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (unlike other cases involving shorter terms in pest-infested cells, "sixteen months of infestation and significant physical harm" was sufficient to state a constitutional claim); and *Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010) (tooth decay resulting in constant pain and headaches constituted an objectively serious medical condition).

Nevertheless, Lewis does not present evidence from which it could be inferred that the defendants were deliberately indifferent to his conditions of confinement or to his medical needs. To state an Eighth Amendment claim, a plaintiff must demonstrate that he suffered a deprivation that "posed a substantial risk of serious harm" that prison officials deliberately ignored. *See Farmer v. Brennan*, 511 U.S. 825, 833-38, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir.2002). The record reflects that Lewis received significant medical care from nurses and a doctor at GBCI, including routine checkups and visits at his own request. The medical staff

was responsive to his request for ibuprofen for his headaches, and nothing suggests that they ignored his medical concerns.

Similarly, Lewis does not present evidence from which it can be inferred that any of the defendants were deliberately indifferent to serious concerns about sewer odors in his cell. Lewis filed only one written complaint regarding the sewer odor, and did not follow up further after a work order was not completed. While some of the correctional officers may have been unkind or unprofessional in mocking Lewis for his smell, the record does not support an inference that anyone deliberately ignored serious danger to Lewis.

### 4.2     First Amendment Retaliation Claims

Lewis alleges that VanLoo and Dillenberg harassed and mocked him. As discussed in previous orders, allegations of mockery and verbal harassment fail to state a claim. *See DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000) ("The use of derogatory language, while unprofessional and deplorable, does not violate the Constitution.") and *Dobbey v. Ill. Dep't of Corrs.*, 574 F.3d 443, 446 (7th Cir. 2009) ("[H]arassment, while regrettable, is not what comes to mind when one thinks of 'cruel and unusual' punishment.").

Lewis further alleges that after he filed complaints about their conduct, VanLoo and Dillenberg retaliated against him. To establish a prima facie case of retaliation, a plaintiff must produce evidence that: (1) he engaged in constitutionally protected speech; (2) he suffered a deprivation likely to deter protected speech; and (3) his protected speech was a motivating factor in the defendants' actions. *See Kidwell v. Eisenhaur*, 679 F.3d 957, 965 (7th Cir.2012) (clarifying allocation of evidentiary burdens at summary judgment in light of *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167

(2009)); *Greene v. Doruff*, 660 F.3d 975, 977 (7th Cir.2011) (same). Lewis satisfies the first element, as he filed complaints using the prison grievance system. *See Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012)("A prisoner has a First Amendment right to make grievances about conditions of confinement.") (quoting *Watkins v. Kasper*, 599 F.3d 791, 798 (7th Cir. 2010)).

Lewis attempts to meet the second element by alleging that Dillenberg wrote him up on a fabricated conduct report. *See Lekas v. Briley*, 405 F.3d 602, 614 (7th Cir. 2005) ("[A] prisoner can sufficiently state a claim for relief when he alleges that prison officials issued baseless disciplinary tickets against him in retaliation for pursuit of administrative grievances."). However, even accepting Lewis's contention that portions of the conduct report were false, he admits to making rude remarks to Dillenberg about his wife, which justify the conduct report for disrespectful/disruptive behavior, and therefore the Court cannot conclude that the report was fabricated. Accordingly, the conduct report is not baseless. Furthermore, to the extent that Lewis contends that Dillenberg and VanLoo retaliated against him by continuing to mock and harass him, or by continuing to occasionally fail to provide him with ibuprofen, such an argument fails to satisfy the third element of a retaliation claim. Persevering in unpleasant behavior is not retaliatory if the continued, unwelcome conduct predates the exercise of First Amendment rights. Given these facts, the Court must conclude that Lewis cannot satisfy either the second or third requirements to state a prima facie case, as he neither suffered a deprivation likely to deter speech nor that his speech was a motivating factor in the defendants' action. Therefore, the Court is obliged to grant the defendants' motion for summary judgment as to Mr. Lewis's retaliation claim.

Accordingly,

Page 13 of 14

Case 2:11-cv-00280-JPS   Filed 03/28/13   Page 13 of 14   Document 166

IT IS ORDERED that the plaintiff's motion for reconsideration (Docket #154) be and the same is hereby DENIED;

IT IS FURTHER ORDERED that the defendants' motion for summary judgment (Docket #95) be and the same is hereby GRANTED, and this case be and the same is hereby DISMISSED; and

IT IS FURTHER ORDERED that the defendants' motion to stay proceedings (Docket #164) be and the same is hereby DENIED as moot.

The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 28th day of March, 2013.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge